**VIRGINIA ELECTRIC & POWER CO.**

v.

**SUN SHIPBUILDING & DRY DOCK CO.**

v.

**STONE & WEBSTER ENGINEER-
ING CORP.**

Civ. A. No. 74–0483–R.

United States District Court,
E. D. Virginia,
Richmond Division.

July 21, 1975.

See also 389 F.Supp. 568.

R. Kenneth Wheeler, and Thomas G. Slater, Jr., Richmond, Va., for plaintiff.

Rosewell Page, III, Charles W. Laughlin, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for defendants.

## MEMORANDUM AND ORDER

WARRINER, District Judge.

This matter is before the Court on motion of plaintiff Virginia Electric and Power Company to compel the production of certain documents for copying, *et cetera,* under Rule 34, Fed.R.Civ.P. Defendant Sun Shipbuilding and Dry Dock Company has refused to produce the documents on the grounds, *inter alia,* that they represent communications between attorney and client and thus are privileged.[1] Defendant also resists discovery of some of the documents on the ground that these documents are a part of the work product of its lawyer, that

---

1. The essentials of the general rule regarding the attorney-client privilege are set out in *U. S. v. Goldfarb,* 328 F.2d 280, 281, citing 8 Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961).

they, or some of them, are the work of experts, and that still other documents are Rule 26(b)(3) "trial preparation materials." The objections will be dealt with separately.

### Attorney-Client Privilege

■ Two tests exist with respect to whether an employee of a corporation is a "client" for purposes of the lawyer-client privilege when dealing with communications from such employee to the lawyer for the corporation. The test most widely employed, apparently is the "control group" test formulated by the decision in *Philadelphia v. Westinghouse Electric Corporation,* 210 F.Supp. 483 (E.D./Pa.1962). This test requires that the communicant be in a position to control or take a substantial part in a decision about any action to be taken upon the advice of the lawyer, or that the communicant be a member of a group having such authority.

■ The control group test was rejected in *Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487 (7th Cir. 1970), *aff'd per curiam by equally divided Court,* 400 U.S. 348, 91 S.Ct. 479, 27 L. Ed.2d 433 (1971). The *Decker* test holds that an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's lawyer is privileged where the employee made the communication at the direction of his superiors and where the subject matter upon which the lawyer's advice was sought by the corporation and dealt with in the communication was within the performance by the employee of the duties of his employment.

■ Neither the Supreme Court of the United States nor the Fourth Circuit Court of Appeals has determined which of these rules should be followed. Accordingly, this Court must decide which reasoning seems best suited to promote justice, bearing in mind that the discovery rules are required to be broadly construed.

■ Having considered such sources as *Attorney-Client Privilege for Corporate Clients—The Control Group Test,* 84 Harv.L.Rev. 424 (1970); *Attorney-Client Privilege in Federal Courts: Under What Circumstances Can Corporation Claim Privilege for Communications from Its Employees and Agents to Corporation's Attorney,* 9 ALR Fed. 685 and the standard encyclopedic works, this Court concludes that the rule most likely to obtain the greatest discovery, the rule more easily applied by the Court, the rule more easily understood by lawyers, the rule more likely to be recognized as reasonable by the parties, and the rule most consonant with the purposes of the attorney-client privilege is the control group test. Accordingly, that test will be applied to the discovery motion to compel production of documents presently before the Court.

The Court is also influenced by the fact that the control group test was formulated in Pennsylvania, the State where defendant has its principal offices, and that it has been more fully developed there than elsewhere. Thus, defendant and its counsel had the maximum opportunity to be forewarned as to the likelihood of the extent to which discovery could be allowed.

■ A later Pennsylvania case, *Congoleum Industries, Inc. v. GAF Corporation,* 49 F.R.D. 82 (E.D./Pa.1969) refined the earlier holding by making clear that a person, no matter what his office, who merely aided in furnishing technical information which along with other information was used as the basis for decisions, is not a person in the control group. A person in the control group must be a person who is in a position to control or substantially influence, as a decision maker, the final decision or decisions necessary for purposes of corporate action with respect to the litigation.

In *Congoleum* the communicators were members of a group designated by the corporation to study and report to the corporation with respect to the pending litigation so as to enable the corporation to prepare its defense. The Court noted that the communicators held advisory positions, not decision-making positions, and that they supplied technical and other data as well as advice as an aid to arriving at a decision.

In another Pennsylvania case, *Honeywell, Inc. v. Piper Aircraft Corporation*, 50 F.R.D. 117 (D.C./Pa.1970) the Court held that the test was whether the person had the authority to control or substantially participate in a decision regarding action to be taken upon advice of counsel or is an organized member of a group that has this authority. If so, his communications with the corporation lawyer were privileged. If not, the communications were not privileged.

More significantly, *Honeywell* held that the corporation seeking to claim the privilege had the burden of demonstrating that the privilege existed. Thus, it was necessary for the corporation to disclose who is within its control group, justify the inclusion of such persons in the control group, show that the documents are related to the procurement of legal advice from a lawyer, and show that the documents were not distributed outside of the control group so as to lose their confidential status. See also *Camco, Inc. v. Baker Oil Tools, Inc.*, 45 F.R. D. 384 (S.D./Texas 1968).

Defendant having failed to meet its burden in this regard, the Court could, and perhaps should, simply order it to produce the documents in accordance with plaintiff's motion. The Court recognizes, however, that defendant sought protection from the motion to compel production not on the basis that it had met the control group test, but because it assumed the control group test did not apply at all. In view of the Court's ruling on this issue, the Court assumes that many, if not most, of the documents which defendant had heretofore withheld will now be produced in accordance with the rationale of the Court's ruling. Defendant may conclude that some of its documents meet the more restricted control group test and that it can meet the *Honeywell* burden. In order to accommodate defendant in this regard, defendant will be granted twenty-one (21) days within which to review the disputed documents, produce those which should be produced in accordance with the holding of the Court, and file the necessary pleadings and proof with the Court as to those which it believes are still privileged under the rulings of the Court, and it is so Ordered.

### Attorney's Work Product

With respect to materials claimed to be immune from discovery because the materials represent the work product of defendant's attorney, it would be well first to define what is meant by "work product." A lengthy annotation at 35 ALR 3d 412, is most helpful in this regard.

> [A]n attorney's "work product" consists of the content . . . of information prepared by the attorney (or in some circumstances by his agents) in his capacity as an attorney representing a client and "with an eye toward litigation." . . . . [I]n most jurisdictions, the content (but not the existence, location, etc.) of such materials as the statements of witnesses, parties and experts, may qualify as the "work product" of an attorney under the proper circumstances. Those circumstances, varying with the kind of material, may exist, for example, when an attorney personally takes the statement of a witness as part of the attorney's trial preparation. . . .
>
> . . . . . .
>
> Witnesses' statements, for instance, have frequently been held "work product" when taken by the attorney or by his agent or investigator, but usually

not when taken by a claim agent for a party or a party's insurer, or when prepared by the witness alone.

Also, in civil cases, a party's contentions or the facts underlying those contentions have usually been held not the "work product" of the party's attorney . . . . 35 ALR 3d 412 § 2[b].

[A] lawyer's "work product" consists of the information he has assembled, his mental impressions and the legal theories and strategies he has pursued or adopted after retainer, in preparation of litigation, as derived from interviews, statements, memoranda, correspondence, legal and factual research, personal beliefs and other tangible or intangible means, where relevant to the possible issues.

. . . . . .

[T]he attorney's work must have formed an essential step in the procurement of the data which the opponent seeks, and the attorney must have performed duties normally attended to by attorneys.

The "work product" protection also applies to some but not all information supplied to an attorney during the preparation of his case. Thus, the impressions, observations, and opinions of a person hired by an attorney and acting under his supervision and direction in the investigation of a case and its preparation for trial are part of his "work product." An attorney cannot, however, by retroactive adoption, convert the independent work of another already performed, into his own "work product." For example, the "work product" privilege does not apply when an attorney, engaged by a party or a party's insurer to prepare for litigation, simply directs or supervises preparatory work done by employees of the party or its insurer, since those employees owe primary allegiance to their employers. On the other hand, when an attorney thus engaged actually hires and arranges to pay his own selected agent to do the desired preparatory work, the product of that work becomes a part of the hiring attorney's "work product," just as if the work had been done by the attorney in person or by an employee of his office. 35 ALR 3d 412 § 3.

Knowledge gained by an attorney through the efforts of an expert whom he has employed to investigate matters of a technical or scientific nature, is part of his "work product." On the other hand, that experts may provide evidence for a party does not, *ipso facto,* make them technical advisors to a lawyer and their advice and reports a part of his "work product." 35 ALR 3d 412 § 4.

■ It is elementary, of course, that in addition to the foregoing the work product of the lawyer must be presently a part of the work files of the lawyer to qualify for the protection of the rule. *U. S. v. Kelsey-Hayes Wheel Co.,* 15 F.R. D. 461 (D.C./Mich.1954). See also *Duplan Corporation v. Deering Milliken, Inc.,* 61 F.R.D. 127 (D.C./S.C.1973); *In Re Horowitz,* 482 F.2d 72 (2d Cir. 1973).

■ Where the statements made or the reports filed are such as would be made by employees in the usual and regular course of normal business procedure, the corporation being on notice that an accident claim is likely, even though the statement or other document was obtained at the direction of a lawyer, such statement or document is not a part of the lawyer's "work product." *Bifferato v. States Marine Corporation,* 11 F.R.D. 44 (D.C./N.Y.1951). See also *Lundberg v. Welles,* 11 F.R.D. 136 (D. C./N.Y.1951).

■ In *Diamond v. Mohawk Rubber Company,* 33 F.R.D. 264 (D.C./Col.1963) a witness' statement was in the hands of the defendant's attorney and had been taken by that attorney in his office by means of a certified shorthand reporter.

The Court held that the statement was not "work product" on the ground that the statement was no more than a narrative of the facts within the witness' knowledge. Defendant made no assertion that the statement was the result of a skillful questioning by the attorney, nor was it made orally and reduced to writing by the attorney. Either of these assertions, if made, might have precluded discovery. Statements and documents which represent the impressions and observations of the witnesses and not those of the attorney or his investigators, are not part of the attorney's "work product." To similar effect is *Scourtes v. Fred W. Albrecht Grocery Co.*, 15 F.R.D. (D.C./Ohio 1953).

A case from within the Fourth Circuit was *Guilford Nat. Bank v. Southern Ry.*, 24 F.R.D. 493 (D.C./N.C.1960), *rev'd on other grounds*, 297 F.2d 921 (4th Cir. 1962) where it was held that plaintiff was entitled to the statements taken by the defendant corporation's investigative agents from a number of witnesses, including employees of the defendant. The Court observed that the plaintiff was not seeking to "intrude into the mental process of defendant's counsel, [his] strategy, or [his] legal theories involved in [his] preparation for trial," and that the statements had been obtained by defendant prior to the institution of the action.

In *Atlantic Coastline Ry. v. Daugherty*, 111 Ga.App. 144, 141 S.E.2d 112 (1965), the Court observed that in every business of significant size was a standard practice of investigating accidents in which it or its servants and agents may be involved while performing its functions. The Court reasoned that to hide the statements obtained or facts discovered in the course of those investigations behind the shield of "work product" would "pervert the purpose of the doctrine," which the Court said was to protect the attorney's preparation for trial from discovery.

In *J. A. Utley Co. v. Borchard*, 372 Mich. 367, 126 N.W.2d 696 (1964) the Court decided that in order for the work product privilege to apply a document had to be the attorney's own work product or the work product of agents employed by the attorney, as distinguished from the product of work done by agents or employees owing primary allegiance to employers other than the attorney.

> To enjoy the privilege . . . the document must be the attorney's own work product; not the product of work done by agents and employees owing primary allegiance to their employers rather than to the attorney. *Borchard, supra*, at 700.

In *Burke v. United States*, 32 F.R.D. 213 (D.C./N.Y.1963) employees of the United States Post Office made certain reports concerning an accident up through the chain of command of the Post Office Department. When a claimant sued, the reports were forwarded to counsel for the Post Office Department. The District Court held that these reports, gathered together by counsel, were not his work product. The Court emphasized that the reports had not been prepared by counsel or his assistants and that there was no showing that the reports represented the product of the "training, skill or knowledge of an attorney, which the work product privilege is aimed at protecting." That the prospect of litigation may have been one of the reasons for requiring the reports, the Court said, is an insufficient basis for denying discovery.

With respect to reports of in-house experts being "work product" when forwarded to counsel, see *Leding v. United States Rubber Co.* 23 F.R.D. 220 (D.C./Mont.1959). Plaintiffs sustained injuries as a result of wearing rubber boots alleged to have been negligently manufactured by defendant. Interrogatories demanded results of the defendant's experts' inspection and analysis of

the allegedly defective boots. The Court held that this material was not work product since the work had not been done by the lawyer or under his supervision or control. The Court reasoned by analogy:

There is no suggestion . . . that the analysis concerning which information is requested in the interrogatory was performed by the attorneys for the defendant, and it cannot be said that such analysis was the work product of said attorneys.

The unsoundness of defendant's position will be clearly seen by its application in other situations. Consider for example a simple suit on an account against a corporate defendant. If the plaintiff in such a case directed an interrogatory to defendant as to what its record of the account showed, it would be no valid objection to say that since the law suit had been started defendant's counsel had requested its accounting defendant to prepare an analysis of the account and hence the information sought by the interrogatory was privileged as the work product of counsel simply because the analysis prepared by defendant's accountants rested in the files of defendant's counsel. *Leding, supra,* at 221.

In *E. I. Dupont De Nemours & Co. v. Phillips Petroleum Co.,* 24 F.R.D. 416 (D.C./Del.1959), plaintiff corporation's staff scientists produced more than 9,000 pages of documents, reports, notes and the like in analyzing the subject of this patent infringement action. After the prospect of litigation arose, the scientists had been ordered to send their reports to plaintiff corporation's legal department and to trial counsel. The Court held that the work performed and the reports made by the in-house experts was not the work product of lawyers. It was the work product of scientists. The Court contrasted the work products as follows:

The staff of experts whose reports, notes, etc., are asked for was at work analyzing and identifying the product[s] . . . both before and after the patent issued. The work which they were doing was scientific work entirely unconnected with any legal matter and far beyond the capacity of most lawyers. As a matter of fact, for a lawyer to intermeddle with it would be ridiculous and probably disasterous. It did not become professional legal work so that any work product rule can be involved in respect of it merely because at some point the prospect of litigation arose and the scientific workers were ordered to send their reports to the plaintiff's legal department or trial counsel. *Dupont, supra,* at 421–22.

Another case decided in Pennsylvania was *United States v. 38 Cases, More or Less, Etc.,* 35 F.R.D. 357 (D.C./Penn. 1964), *app. dism'd,* 369 F.2d 399. There the Court held, at page 361–62, that the fact that experts may provide evidence for a party does not, *ipso facto,* make them technical advisors to the party's lawyer and their advice and report a part of his work product. The Fifth Circuit has gone even further in *United States v. McKay,* 372 F.2d 174 (5th Cir. 1967). The Commissioner of Internal Revenue sought an appraiser's report prepared at the request of an estate's executor and attorney. Production of the report was resisted on the grounds that the appraisal report had been obtained by the lawyer for the purpose of advising and adequately representing the estate in anticipation of possible litigation involving the estate's tax liability. The Court concluded that the report was "in no sense the work product of the lawyer" but rather was "solely the work product of the expert witnesses whom he employed to prepare it." To similar effect is *Grand Lake Drive-In, Inc. v. Superior Court of Alameda County,* 179 Cal.App.2d 122, 3 Cal.Rptr. 621, 86 ALR 2d 129 (1960).

A situation much more simple but in many respects analogous to the present

case occurred in *Sherman v. M. Lowenstein & Sons, Inc.,* 42 Misc.2d 770, 248 N.Y.S.2d 1000, *reh. den.* 248 N.Y.S.2d 1002 (1964). This was an action against the manufacturer and the retailer of a pair of pajamas that had ignited while being worn by the plaintiff. An expert's laboratory report of the results of tests conducted on an allegedly identical pair of pajamas purchased by the plaintiff two or three weeks after the accident was held not to be the work product of the plaintiff consumer's attorney.

In *Seven-Up Co. v. Get Up Corp.,* 30 F.R.D. 550 (D.C./Ohio 1962) defendant sought to obtain complete information, including the answers received from a consumer's poll taken by plaintiff. The interviews had been conducted by an employee of the plaintiff corporation's retained counsel, under the counsel's supervision, to determine possible confusion between the trademarks "7-Up" and "Get Up." It was held that this material was discoverable, despite the fact that it was gathered together for purposes of the litigation by the lawyer's employees and under the lawyer's supervision. The Court held that it simply was not the lawyer's "work product."

In *Richards-Wilcox Mfg. Co. v. Young Spring & Wire Corp.,* 34 F.R.D. 212 (D.C./Ill.1964) a team of experts was sent to observe the operation of a conveyer system in defendant's factory. Having observed the system they prepared and forwarded to plaintiff's attorney notes and reports based upon their observations. The Court reasoned that discovery of reports of the observers' observations could not constitute a substantial intrusion into the thoughts and trial plans of the plaintiff's attorney. Appropriately expressing this Court's view, Chief Justice Campbell of the Illinois District Court stated:

No longer can we or should we protect archaic principles fostered to protect and promote what was once throught to be the desired sporting element of a

trial—surprise. This element of surprise has departed with our modern Federal Rules of Civil Procedure. *Richards-Wilcox, supra,* at 213.

The Intermediate Appellate Court in Michigan has held that no statement, whether of a party or other witness, and whether taken by a lawyer or someone else, is protected by the work product restriction. *Powers v. City of Troy,* 28 Mich.App. 24, 184 N.W.2d 340 (1970). By this holding the Court makes clear that lawyer's work product means just that and no more. The Court said:

[N]o statement, whether of a party himself or of another witness, and whether taken by his attorney or someone else is protected by the work product restriction and . . . such statements are freely discoverable upon a showing of cause or need, unless they are protected by the absolute attorney-client privilege applicable only to confidential communications between an attorney and his client. *Powers, supra,* at 347.

There do not appear to be any controlling Fourth Circuit or U. S. Supreme Court decisions defining and explicating the applicability of the work product rule in the present context. For every decision above cited there may very well be a decision with a directly contrary holding.

This Court, then, must determine which decisions best comport with affording the parties "the just, speedy, and inexpensive determination" of this litigation. The views, decisions and holdings above set out and construed represent this Court's views.

 Defendant generally adopted the position, in resisting production, that any document that was generated by defendant's employees and furnished by defendant to its counsel thereby becomes a part of counsel's work product. That this was an erroneous position is apparent when compared with the law as hereinabove set forth.

Defendant is directed to review the requested documents under the criteria of this memorandum and within twenty-one days from the entry hereof produce all discoverable material as required by plaintiff's motion to produce.

Any requested documents not so produced by defendant must be filed with the Court for *in camera* inspection together with proof of the specific basis upon which work product non-production is claimed in each case. Such filing and proof must also be filed within twenty-one days of the entry of this order, and it is so ORDERED.

### EXPERT WITNESSES

█ Defendant undoubtedly has retained certain experts to assist it in trial preparation. The production of the reports of such experts may be required only under the provisions of Rule 26(b)(4)(A) if such experts are designated as trial witnesses, or under Rule 26(b)(4)(B) if such experts are not designated as trial witnesses. Defendant may also have "specially employed" experts for trial assistance (whatever "specially employed" may mean). In such case, production of reports could only be required under Rule 26(b)(4)(A) or 26(b)(4)(B), as the case may be.

█ As to a person who is an expert in a trade or science but who is neither retained nor specially employed but merely is, has been, and will be an employee of defendant without regard to the pendency of the claim, the Court has considerable doubt as to how or whether either (b)(4)(A) or (b)(4)(B) would apply. The Court is inclined to believe that such a person properly fits within the 26(b)(1) category (or possibly 26(b)(3)) and thus his reports would be fully discoverable on a motion to produce.

The Court reaches this conclusion after an analysis of the language of Rule 26(b)(4), the Advisory Committee's Notes thereto (found in 48 F.R.D. 503–505), and applicable cases.

#### A. *The language of Rule 26(b)(4)*

The opening sentence of Rule 26(b)(4) refers to an expert in an unqualified manner—there are no adjectives modifying the noun "expert." In (b)(4)(A)(i) the word "expert" becomes an adjective modifying the noun "witness" and then in two other instances reverts to the noun classification. In 26(b)(4)(B) "expert" is used as a noun but it is modified by the phrase "who has been retained or specifically employed."

It may very well be that the several ways of treating the word "expert" are intended to indicate that in all uses of the term the same condition and type of person is intended. The only clearly drawn distinction is between experts expected to testify and those not expected to testify. But this difference is only as to the use to which the expert is put, not as to his status as an expert.

█ *Black's Law Dictionary* (4th ed. 1951) is of little help since its definitions reach only the obvious. Common to the several definitions, however, is the trait of impartiality, which constitutes a distinguishing characteristic of an expert. One aspect given by Black is "one who can see all sides of a subject." Another aspect is, "persons selected by the Court or parties in a cause, on account of their knowledge and skill . . . ." It is evident from the definitions that an expert is expected to owe his allegiance to his calling and not to the party employing him. In order to be an expert one must be in a position to testify as an expert and not as a partisan.

#### B. *The Advisory Committee Notes*

█ Referring to Subdivision (b)(4) as a whole, the Committee observed:

This is a new provision dealing with discovery of information (including

facts and opinions) obtained by a party from an expert *retained by that party in relation to litigation* . . . . [emphasis supplied]

This explanation, applied to the whole of Subdivision (b)(4), indicates that when an expert is referred to anywhere in the Subdivision, such reference contemplates an expert who has been retained for purposes of the pending litigation.

The next sentence of the Committee Notes emphasizes the distinction between testifying experts and non-testifying experts. But the sentence does not distinguish between the unmodified term "experts," and "experts who have been retained or specifically employed." Though the language is different it is difficult to perceive a difference in meaning. If all references to experts in Rule 26(b)(4) refer to retained experts, the additional language adds nothing unless "specifically employed" means something different from "retained."

The Court has been unable to find any opinion or definition to aid in the determination of what "specifically employed" means. It could mean assigning one who is already an employee of a party to work on the matter at issue. This is the meaning defendant would contend for. But this meaning does not take into account the fact that an expert should be impartial, should owe his allegiance to his calling, should not be a partisan and should be able to "see all sides" of the issue. A regular employee, assigned as an expert, meets none of these prerequisites.

▮▮▮▮▮ The Court believes that "specially employed" refers only to the manner by which the services of the expert are obtained; that is to say, that the expert is put on the payroll for the specific purpose of deriving facts and opinions for use in trial preparation or anticipated litigation. The distinction between "retained" and "specially employed" is the difference between hiring the expert as an independent contractor

and hiring him as an employee *pro hac vice.*

The Court's view in this regard is buttressed by the final two sentences of the first paragraph of the Notes. There the Committee describes an expert who acquired his information as an "actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit." Such an expert, says the Committee, should be treated as an ordinary witness.

▮▮▮▮ The Court perceives this to imply that though one be an expert, if his contact with the case is not in his capacity as an impartial observer, but is instead as one going about his duties as a loyal employee, then he "should be treated as an ordinary witness."

▮▮▮▮ Further support for this view is contained in Rule 26 itself, as well as in the Notes. Both refer to protective orders requiring an opposing party to pay the "fees and expenses" when "further discovery" is permitted. The Notes interpret this language as permitting a requirement to "compensate *the expert* for his time" and to "compensate *the party* . . . for past expenses . . . incurred . . . ." Thus, it is reasonable to infer that a master-servant relationship between a party and his expert was not contemplated within the ambit of Subdivision 26(b)(4).

The language of the Notes which gives the Court the most trouble makes specific mention of the term "specially employed."

> Subdivision (b)(4)(B) deals with an expert who has been retained or specially employed by the party in anticipation of litigation or preparation for trial (thus excluding an expert who is simply a general employee of the party not specially employed on the case), but who is not expected to be called as a witness.

Again the juxtaposition of terms admits of two inferences. One is that the distinction is intended between (1) an ex-

pert "who is simply a general employee," and (2) an expert who *was* simply a general employee but who has been specially assigned to the case. This meaning would clearly have been required had the Committee used the word "assigned" in place of the word "employed." But by merely repeating the term "specially employed" the Committee added nothing to its meaning. Hence, the Court remains persuaded that "specially employed" merely covers instances of employment of an expert for purposes of the specific litigation. If it had been meant to convey the meaning urged by defendant it doesn't convey that meaning in a convincing manner.

Indeed, when the Committee next approaches the phrase they convert "specially employed" to "specially consulted."

Subdivision (b)(4)(B) is concerned only with experts retained or specially consulted in relation to trial preparation. Thus, the Subdivision precludes discovery against experts who were informally consulted in preparation for trial, but not retained or specially employed.

■ The Committee goes on to note that an expert's opinion is not privileged simply because he is an expert. The privilege is influenced instead by notions that to grant discovery would be unfair.

The next two paragraphs of the Notes again refer to expert witness fees and expenses—not a consideration where the expert is an ordinary employee—and make provision for reimbursement.

■ Taken as a whole, the Committee's Notes tend to confirm rather than contradict the Court's opinion that the "in house expert" is to be treated, for purposes of discovery, as an ordinary witness. This view does not in any way prohibit any expert, in house or out, from giving an opinion in testimony at trial. It merely opens up that opinion, based on facts gained in the course of his employment, to discovery under Rule 26(b)(1).

### C. *Applicable Cases*

*United States v. Nysco Laboratories, Inc.*, 26 F.R.D. 159 (E.D./N.Y.1960), points up not only the discoverability of a party's expert's work and opinion but also the desirability of such discovery. In *Nysco* the defendant objected to certain interrogatories because they sought to "secure work performed by experts or called for experts' opinions." Without commenting as to whether the opinions were derived from in house or retained experts, the Court observed, at page 162:

Realistically speaking, the resolution of the entire case depends upon medical and expert testimony and opinion. The necessities of such a case transcend the usual limitations which may otherwise be imposed upon discovery proceedings. "The primary concern of courts of justice is to elicit truth essential to correct adjudication." To the extent that information concerning medical and scientific facts is within the knowledge or possession of the defendants, the Court believes such information should be disclosed. [Citation omitted]

As in *Nysco*, expert testimony is the whole of the instant case. If expert opinion is not discoverable then the trial will consist of one ambush and one surprise after another.

In *E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 24 F.R.D. 416 (D.Del.1959) a motion for production of documents reached reports of experiments and opinions based thereon by the plaintiff's scientists. The Court presumes these were in house experts. The District Court required production for the same practical reasons that actuated the Court in *Nysco*. In 24 F.R.D. 416, at page 421 the *Du Pont* Court stated:

In the ordinary lawsuit discovery should not be allowed where the facts

which it is framed to develop are useful and relevant for no purpose other than to enable the moving party to show by cross-examination or otherwise that an expert (presumably, but not certainly, to be called by the opposing party) has inadequate bases for an opinion which he is expected to give. . . . So, if this were a simple mechanical patent, I would sustain many of the objections of both parties to the production of the documents asked for under their Rule 34 motions.

However, both parties appear to fully recognize that this case is an unusual one in that the adequacy of the procedures used by experts, or available to them, to determine the chemical properties of a product such as that claimed, comes very close to being an ultimate fact and a major issue in the case. It is impossible for the plaintiff to establish infringement or for the defendant to attack the validity of the patent except by opinion testimony of experts. . . . Looked at from a practical rather than a legalistic point of view, the facts of a case like this are the opinions of experts and the groundwork for those opinions comes within the ambit of a proper search for facts beyond the knowledge of the moving party.

Thus it would seem that the necessities of a case such as this transcend some of the limitations upon discovery which apply in ordinary cases. Unless procedures can be inquired into and records of actual tests produced, neither party can have any idea of what the evidence against it is going to be.

The representations of counsel at the several status conferences as well as the pleadings themselves persuade this Court that the conclusions as stated in *Du Pont* are apt in every sense for the instant case.

With equal aptness is the opinion in *Leding v. United States Rubber Co.,* 23 F.R.D. 220 (D.Mont.1959). There defendant resisted answering interrogatories respecting defendant's expert's analysis of some rubber boots on the ground that the answers constituted attorney's work product and accordingly were privileged. The Court quickly disposed of this contention by pointing out that it was the defendant's *expert's* opinion which was sought, not the defendant's *lawyer's* opinion. The experts, said the Court, were hired by defendant, not by defendant's lawyer.

The Court went on to discuss the only arguably valid ground for objection— that plaintiff was seeking defendant's expert's opinion—a Rule 26(b)(4) objection. At page 222 the Court ruled (citations omitted):

Courts which have declined to permit discovery concerning tests or investigations of experts have usually done so upon the general basis of unfairness to the party who engaged the expert, the theory being that it is unfair to permit one party to an action to obtain free of charge information for which the other party has paid or obligated himself to pay a substantial amount of money. This situation does not exist in the instant cases because an examination of the file shows that the plaintiffs have likewise expended or obligated themselves to expend money for analysis of the boots by other experts and that the result of such analysis has been made available to the defendant. As pointed out in *Sachs v. Aluminum Co. of America, supra,* "The primary concern of courts of justice is to elicit truth essential to correct adjudication". Certainly this end can best be achieved in the instant cases by a full disclosure of all information available to either party.

Without specific guidance of *stare decisis* as to the proper disposition of the motion, the Court is strongly influenced by the reasoning in the above three cases where judges were dealing with problems similar to those confronting this Court.

■ For all the foregoing reasons the Court rules that documents derived from regular employees of defendant are not entitled to a qualified immunity from discovery simply because the employees are experts and the documents contain their expert opinions, findings and factual analyses.

With respect to documents which defendant has refused to produce on this ground the same procedure set out above for attorney-client privilege claims shall be followed by the parties, and it is so ORDERED.

### TRIAL PREPARATION MATERIALS

■ Even though not immune because of the attorney-client privilege, the work product immunity, or the expert opinion restrictions, a document may nevertheless be limited in its susceptibility to a request for production by the "trial preparation material" provision of Rule 26(b)(3). This "trial material" rule is distinct from all the above listed limitations and may be that limitation applicable to most of the documents in question here.

The provisions of Rule 26(b)(3) are straightforward and easily understood. No interpretation or construction seems necessary. In essence, if anyone prepares documents for a party in anticipation of litigation or for trial, documents so prepared are not discoverable except upon a showing of "substantial need" and "undue hardship." The Court interprets 26(b)(3) to first put the burden upon the party opposing discovery to show, as to each document, that it was prepared under (b)(3) circumstances. If there be such a showing to the satisfaction of the Court, the burden shifts to the party seeking discovery to show, as to each document, the substantial need and undue hardship.

As observed above, the Court believes both parties hereto have substantial need for the reports of experiments, observations, tests and opinions of the other. The party seeking discovery need not dwell on that element of proof. The question of undue hardship presents a different guise and the Court expects the parties to develop this if the occasion arises.

With respect to documents which defendant has refused to produce under the claim that it is (b)(3) material, the parties shall proceed in like manner as hereinabove required.

The parties are cautioned not to confuse the grounds for immunity. Each is different and each embodies distinct legal and practical considerations. More than one ground may attach to the same document; but in presenting the matters to the Court the distinction between the grounds should clearly be maintained.

And it is so Ordered.